**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT VOLIO, KEVIN BRADY, SHAWN MARTIN, CASEY TIERNEY, ANIELLO BARRELLA, and MARK METZLER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUGARHOUSE HSP GAMING, L.P. d/b/a RIVERS CASINO PHILADELPHIA and RUSH STREET GAMING LLC,<br><br>Defendants. | Case No. 2:25-CV-00039-JDW<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiffs Robert Volio, Kevin Brady, Shawn Martin, Casey Tierney, Aniello Barrella, and Mark J. Metzler ("Plaintiffs"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia and Defendant Rush Street Gaming LLC ("Defendants"), based on Plaintiffs' own personal knowledge and on information and belief derived from, among other things, investigation by counsel and review of public documents, as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard Plaintiffs' and other similarly situated individuals' ("Class Members," as defined *infra*) personally identifiable information ("PII").

2. Defendants own and operate a casino and entertainment development located along the Delaware River in the Fishtown neighborhood of Philadelphia.

3. On or about November 18, 2024, Defendants investigated suspicious activity that

had occurred on their computer network. Their investigation revealed that an unauthorized actor accessed and exfiltrated certain files from Defendants' servers ("Data Breach"). Defendants identified individuals whose PII may be involved and determined that the data at issue includes names, dates of birth, driver's license numbers, passport information, Social Security numbers, and bank account information used for direct deposits.

4.      On information and belief, Defendants began sending out notice letters to impacted persons on or about December 30, 2024. According to reports and upon information and belief based upon investigation of counsel, a second round of notice letters was sent to additional impacted persons beginning on or about February 28, 2025.

5.      Defendants failed to adequately protect Plaintiffs' and Class Members' PII—and failed to encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions as well as their utter failure to protect their customers' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

6.      Plaintiffs bring this class action on behalf of themselves and all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) adequately vet their data security practices; (iii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; (iv) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents; and (v) timely notify Plaintiffs and Class Members of the Data

2

Breach. Defendants' conduct amounts to negligence at the very least and violates federal and state law.

7.     Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to ensure that Defendants had adequate and reasonable safeguards and measures in place to protect the PII of Plaintiffs and Class Members after that information was transferred and entrusted to them in the regular course of business.

8.     More specifically, Defendants failed to take and implement available steps to prevent an unauthorized disclosure of data, and failed to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption, storage, and destruction of data, even for internal use. As a result, Plaintiffs' and Class Members' PII was compromised through disclosure to unknown and unauthorized third parties.

9.     Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe and should be entitled to injunctive and other equitable relief.

10.    Plaintiffs and Class Members have suffered and will continue to suffer injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; (vi) financial losses caused by misuse of their PII; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' custody, control, or possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

11.    Plaintiffs and Class Members seek to remedy these harms and prevent any future

3

data compromise on behalf of themselves and all similarly situated persons whose PII was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## II.   PARTIES

### *Plaintiff Kevin Brady*

12.    Plaintiff Kevin Brady is an adult individual and ['individual" and "natural person" have same meaning] citizen of Pennsylvania, residing in Bucks County, where he intends to stay.

13.    Plaintiff Brady, a former customer of Rivers Casino, provided his PII to Rivers Casino as a condition of obtaining a player's card and gambling. Upon information and belief, Plaintiff Brady's PII was stored and maintained by Defendant Rivers Casino.

14.    Additionally, Plaintiff Brady was a former employee of Rivers Casino in Philadelphia from January to March of 2020 and provided his PII to Rivers Casino as a condition of his employment.

15.    Plaintiff Brady received a notice letter from Defendant Rivers Casino dated December 30, 2024, informing him that his PII, including his Social Security number, bank information, and other sensitive information, had been exposed in the Data Breach.

### *Plaintiff Shawn Martin*

16.    Plaintiff Shawn Martin is an adult individual and citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, where he intends to stay.

17.    Plaintiff Martin, a current customer of Rivers Casino, provided his PII to Rivers Casino as a condition for receipt of services and through a job application. Upon information and belief, Plaintiff Martin's PII was stored and maintained by Defendant Rivers Casino.

18.    Plaintiff Martin received a notice letter from Defendant Rivers Casino dated December 30, 2024, informing him of the Data Breach and the exposure of his PII.

19.     The notice letter informed Plaintiff that his Social Security number and/or bank account information were potentially compromised in the Data Breach.

### Plaintiff Robert Volio

20.     Plaintiff Robert Volio is an adult individual and citizen of Pennsylvania, residing in Philadelphia, where he intends to stay.

21.     Plaintiff Volio, a former employee of Rivers Casino, provided his PII to Rivers Casino as a condition of his employment. Upon information and belief, Plaintiff Volio's PII was stored and maintained by Defendants.

22.     Plaintiff Volio received a notice letter from Defendant Rivers Casino dated December 30, 2024, informing him of the Data Breach and the exposure of his PII.

23.     The notice letter informed Plaintiff Volio that his name, Social Security number, and bank account information was potentially compromised in the Data Breach.

### Plaintiff Casey Tierney

24.     Plaintiff Casey Tierney is an adult individual and citizen of Pennsylvania, residing in Philadelphia where he intends to stay.

25.     Plaintiff, a former employee of Rivers Casino, provided his PII to Rivers Casino as a condition of employment. Upon information and belief, Plaintiff Tierney's PII was stored and maintained by Defendant Rivers Casino.

26.     Plaintiff Tierney received a notice letter from Defendant Rivers Casino dated December 20, 2024, informing him of the Data Breach and the exposure of his PII.

27.     The notice letter informed Plaintiff that his name, Social Security number and/or bank account information used for direct deposit was potentially compromised in the Data Breach.

*Plaintiff Neil Barrella*

28.    Plaintiff Aniello (Neil) Barrella is an adult individual and citizen of Pennsylvania, residing in Hatfield, Montgomery County where he intends to stay.

29.    Plaintiff, a current customer of Rivers Casino, provided his PII to Rivers Casino as a condition of gambling. Upon information and belief, Plaintiff Barrella's PII was stored and maintained by Defendant Rivers Casino.

30.    Plaintiff Barrella received a notice letter from Defendant Rivers Casino dated February 28, 2025, informing him of the Data Breach and the exposure of his PII.

31.    The notice letter informed Plaintiff that his name, date of birth, Social Security number and driver's license number were potentially compromised in the Data Breach.

*Plaintiff Mark J. Metzler*

32.    Plaintiff Mark J. Metzler is an adult individual and citizen of Pennsylvania, residing in Philadelphia where he intends to stay.

33.    Plaintiff, a current customer of Rivers Casino, provided his PII to Rivers Casino as a condition of gambling. Upon information and belief, Plaintiff Metzler's PII was stored and maintained by Defendant Rivers Casino.

34.    Plaintiff Metzler received a notice letter from Defendant Rivers Casino dated February 28, 2025, informing him of the Data Breach and the exposure of his PII.

35.    The notice letter informed Plaintiff that his name, date of birth, Social Security number and driver's license number were potentially compromised in the Data Breach.

*Defendants*

36.    Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia is a limited partnership formed under the laws of Delaware with a principal place of business located

at 1001 North Delaware Avenue, Philadelphia, PA 19123.

37.     Defendant Rush Street Gaming LLC is a limited liability company formed under the laws of Delaware with a principal place of business, on information and belief, located in Illinois.

### III.    JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class Members who are diverse from Defendants, and (4) there are more than 100 Class Members.

39.     The Court has general personal jurisdiction over Defendants because Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia maintains a principal place of business in this District and/or conducts significant business in this District, and the events giving rise to Plaintiffs' and Class Members' claims arise out of Defendants' contacts with this District.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia is a resident and citizen of this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### IV.    FACTUAL ALLEGATIONS

#### A.     Defendants' Business

41.     Defendants are a casino entertainment development in the Fishtown neighborhood of Philadelphia. Located along the Delaware River, they offer gaming, dining, and other forms of entertainment.

42.     In the regular course of their business, Defendants collect highly private PII from employees for employment purposes, and patrons, customers, and other individuals who interact

or otherwise transact with Defendants. Defendants store this highly sensitive information digitally.

43.     Defendants were obligated, as vendors who collect sensitive consumer data, to protect that information.

44.     On information and belief, Defendants are required by law to maintain the privacy and security of individuals' PII and to provide individuals with notice if a breach occurs that may have compromised the privacy or security of that information. Defendants had obligations under the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA") and industry standards to keep PII confidential and to protect it from unauthorized access and disclosure.

45.     Defendants also had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendants had a legal duty to keep their customers' PII safe and confidential.

46.     Upon information and belief, Defendants made promises and representations to their patrons or employees, including Plaintiffs and Class Members, that the PII collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.[1]

47.     On information and belief, Plaintiffs and Class Members provided personal information to Defendants in exchange for gaming and other entertainment services or employment, with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access. Included in the sensitive PII provided to Defendants, per Defendants' breach notice letters to numerous state attorneys general, is at least Plaintiffs' and Class Members' names,

---

[1] *Privacy Policy*, Rivers Casino Philadelphia,
https://www.riverscasino.com/philadelphia/privacy-policy (last visited Apr. 17, 2025).

dates of birth, driver's license numbers, passport information, Social Security numbers, and bank account information used for direct deposits.

48.     Defendants derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendants could not perform the services they provide and monetize their casino, gaming, and entertainment business.

49.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

**B.      The Data Breach**

50.     On information and belief, Defendants began sending notices of the Data Breach to impacted persons in a first round of letters on December 30, 2024 ("December 30 Letter").

51.     Defendants' December 30 Letter, which it provided to the Attorney General of Vermont, states the following:

> We recently responded to and investigated an incident that involved unauthorized access to certain Rivers Casino Philadelphia computer systems. No other Rivers Casino locations were involved. Upon identifying the incident, we immediately secured the involved systems and launched an investigation. Through the investigation, we determined that . . . an unauthorized actor accessed and/or took certain files stored on our computer servers. We reviewed the files that may have been involved and on November 18, 2024, we determined that one or more file(s) contained your name and one or more of the following: Social Security number, and/or bank account information used for direct deposit.[2]

---

[2] *Data Breach Letter*, https://ago.vermont.gov/sites/ago/files/documents/2024-12-30%20Rivers%20Casino%20Philadelphia%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited Feb. 27, 2025).

52.    A second round of notice letters subsequently was sent to additional persons impacted by the Data Breach, on or beginning as early as February 28, 2025 ("February 28 Letter").

53.    Defendants' February 28 Letter, which it also provided to the Attorney General of Vermont, states the following, similar to the December 30 Letter:

> We recently responded to and investigated an incident that involved unauthorized access to certain Rivers Casino Philadelphia computer systems. Upon identifying the incident, we immediately secured the involved systems and launched an investigation. Through the investigation, we determined that . . . an unauthorized actor accessed and/or took certain files stored on our computer servers. We reviewed the files that may have been involved and on February 16, 2025, we identified file(s) containing your name and one or more of the following: date of birth, Social Security number, driver's license number and/or passport.

54.    Defendants have provided scant information about the breach other than what is in their notice letter.

55.    Defendants did not state why they were unable to prevent the Data Breach or which security feature failed.

56.    Despite acquiring knowledge about the breach as early as November 18, 2024, on information and belief Defendants did not begin sending notice letters until over a month later, in late December 2024, and offer no explanation why a second round of letters was sent beginning approximately two months later in late February 2025.

57.    Defendants have, to date, provided no explanation for why they did not contact affected persons about the Data Breach sooner.

58.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII. Nor did Defendants take the precautions and measures needed to

ensure their data security protocols were sufficient to protect the PII in their custody, control, or possession.

59.    As a result, a third party accessed and acquired files containing unencrypted PII of Plaintiffs and Class Members.

60.    Defendants' failure to promptly notify Plaintiffs and Class Members that their PII had been accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiffs and Class Members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class Members have suffered and will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

61.    Individuals affected by the Data Breach are at risk that their data will be sold or released on the dark web and, ultimately, illegally used in the future.

### C.    Cicada3301 Ransomware Gang Involvement

62.    On February 7, 2025, Cicada3301, a ransomware gang, claimed responsibility for committing the Rivers Casino Philadelphia Data Breach.[3]

63.    Cicada3301 is a ransomware gang that emerged in June 2024, operating as a ransomware-as-a-service platform, which engages in double extortion tactics— "forcing its targets to pay both for a key to decrypt their systems and for not selling or publicly releasing stolen data."[4] Since its inception, Cicada3301 has targeted organizations across multiple industries, including casinos, healthcare providers, labor unions, financial institutions, and government entities.

---

[3] See Paul Bischoff, *Ransomware Gang Claims Data Breach at Philadelphia Casino: SSNs and Bank Account Info Leaked*, Comparitech (Feb. 7, 2025), https://www.comparitech.com/news/ransomware-gang-claims-data-breach-at-philadelphia-casino-ssns-and-bank-account-info-leaked/.
[4] *Id.*

Cicada3301 has claimed responsibility for eight confirmed attacks, and another 43 unconfirmed attacks that have not yet been publicly acknowledged by the targeted organizations.[5]

64.     Cicada3301 claimed to have stolen 2.561 terabytes of information from Rivers Casino Philadelphia and Rush Street Gaming, including Social Security numbers, direct deposit information, and personal and corporate information.[6]

65.     Upon information and belief, and based upon investigation of counsel (as discussed in more detail *infra*), Cicada3301 was also able to steal certain patron information (names, IDs, mailing addresses, emails, phone numbers, dates of activity, amounts spent), information about employees (employee numbers, names, monthly salary details), and certain vendor information.

**D.     The PII Stolen in the Data Breach Is Exposed and Available on the Dark Web**

66.     Cicada3301 threatened to leak the entirety of the stolen data and publicly posted samples of stolen documents on its website on the dark web.[7] In total, Cicada3301 posted a sample of 11 stolen documents.

---

[5] *Id.*

[6] *Id.*

[7] http://cicadabv7vicyvgz5khl7v2x5yygcgow7ryy6yppwmxii4eoobdaztqd.onion/jvl44u7tz6cimtg k4vumczz4omwhb547.



67.    Among the posted stolen documents was the Rivers Casino Philadelphia's Quarterly Cash Discount Program Report, which tracks high-value patron's gambling activity, spending, and associated casino rewards from Q3 of 2022 to the present. This document contains detailed player tracking data, including Patron ID numbers, full names, last gaming session dates,

accrued cash discounts, total table days played, gross table actuals (i.e., amount wagered), table drop (i.e., amount lost to the house), table theo (i.e., theoretical casino revenue per player), total table hours, and average hours per day. The exposure of this data creates significant risks, including privacy violations and financial targeting of high-value players.

**Rivers Casino Philadelphia**
**Quarterly Cash Discount Program**
**Q1 2022 - Present**
Green indicates cash comp has been paid, red indicates cash comp is unpaid.

| Quarter of Gaming Month | PTNID | First Name | Last Month | Last Gaming Date | Paid | Accrued Cash Discount | Table Days | Gross Table Actual | Table Drop | Table Theo | Table Hours | Avg Hours Per Day | Table Hold% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024 Q3 | Suno | IfV | ae | | | | 6 | ($20,055) | $42,550 | $1,572 | 4.0 | 0.7 | (47.1%) |
| | Sosoe30/12 | Ty | Iun | | | | 27 | $25,959 | $65,270 | $5,665 | 39.0 | 1.4 | 39.8% |
| | Sotu | | | | | $31,455 | 31 | $314,550 | $790,740 | $120,095 | 87.6 | 2.8 | 39.8% |
| | S0S0 3933 | Ts | | | | $6,632 | 4 | $132,640 | $159,000 | $10,615 | 6.1 | 1.5 | 83.4% |
| | Total | | | | | | 68 | $453,095 | $1,057,560 | $137,947 | 136.6 | 2.0 | 42.8% |
| 2024 Q2 | Sosu | 232 Tono | Buen | 2024-09-69 | | | 5 | $5,673 | $64,725 | $1,723 | 2.5 | 0.5 | 8.8% |
| | Sosol 17292 | Tese | Nee | 2024-06-29 | Yes | $2,875 | 34 | $57,492 | $133,520 | $12,477 | 83.0 | 2.4 | 43.1% |
| | Sosoua 1618 | Is | Ihat | 21-09-00 | | | 45 | $24,828 | $603,280 | $64,056 | 56.4 | 1.3 | 4.1% |
| | Sotai 7717 | Tor aau | 3lc | 2024-08-00 | | | 1 | ($216,550) | $220,750 | $51,614 | 11.6 | 11.6 | (98.1%) |
| | Sosal 975 | Ierr | Iurru | 2o-o | | | 1 | $9,500 | $9,500 | $685 | 0.3 | 0.3 | 100.0% |
| | Sosin 10048 | Ys | Il | 201-09-20 | | | 33 | ($71,523) | $1,652,710 | $137,094 | 69.7 | 2.1 | (4.3%) |
| | Sofal 232 | Twth | | 2018-05 | | | 5 | $36,380 | $36,100 | $2,190 | 6.8 | 1.4 | 100.8% |
| | S6S07xC24q | Io e | Ilut | 20-4-00-20 | | | 23 | ($10,425) | $109,020 | $31,926 | 27.6 | 1.2 | (9.6%) |
| | Total | | | | | | 147 | ($164,626) | $2,829,605 | $301,765 | 257.9 | 1.8 | (5.8%) |
| 2024 Q1u | SoSoiP9040 | Io o | Inva | 20, 4 07 20 | | | 6 | $27,515 | $84,500 | $5,384 | 7.6 | 1.3 | 32.6% |
| | Sosov 4030 | Io o | Il | 20c 8 0 | | | 1 | $10,485 | $10,500 | $649 | 0.9 | 0.9 | 99.9% |
| | Sosaiur0a0 | Io o | Iunva | 20, 4-09-90 | | | 26 | $37,686 | $114,540 | $13,706 | 77.2 | 3.0 | 32.9% |
| | So1077 4030 | Io o.e | Iur | 2024-09-70 | Yes | $55,603 | 70 | $556,034 | $3,130,610 | $401,725 | 206.4 | 2.9 | 17.8% |
| | SosA730996 | Iooo | Iurr | 2024-05-20 | Yes | $20,242 | 32 | $404,848 | $1,555,020 | $144,724 | 86.5 | 2.7 | 26.0% |
| | Sosin 8030 | Io o | Iin | 20-4-09 | | | 1 | ($6,175) | $20,200 | $1,736 | 1.9 | 1.9 | (30.6%) |
| | S6su x vo30 | Iooo | Io | 2024-09-16 | | | 17 | $59,785 | $95,840 | $12,928 | 26.9 | 1.6 | 62.4% |
| | Sosu x30d30 | Io v0 | Iu | 201-4-09 | | | 36 | $7,809 | $338,560 | $80,265 | 75.3 | 2.1 | 2.3% |
| | Total | | | | | | 189 | $1,097,987 | $5,349,770 | $661,116 | 482.6 | 2.6 | 20.5% |
| 2023 Q4 | So10u13090 | Iang | Siang | 2024-09-30 | | | 7 | $49,975 | $93,800 | $2,538 | 5.8 | 0.8 | 53.3% |
| | Sosu x6030 | Io vo | Iur | 2024-01-28 | | | 1 | ($3,410) | $1,500 | $293 | 0.8 | 0.8 | (227.3%) |
| | Sosu x30090 | Iono | Ihr | 2024-09-15 | Yes | $3,903 | 57 | $78,057 | $222,170 | $20,549 | 117.3 | 2.1 | 35.1% |
| | Sosu x9036 | Ibnof | Iv | 2024-09-20 | Yes | $12,752 | 38 | $127,519 | $958,100 | $112,957 | 81.3 | 2.1 | 13.3% |
| | Sosu x30090 | Iono | Iiv | 2024-09-15 | | | 1 | $30,520 | $29,800 | $4,325 | 7.2 | 7.2 | 102.4% |
| | Sosu x30990 | Iono | Iun | 2024-06-02 | | | 45 | $28,496 | $522,295 | $76,917 | 96.3 | 2.1 | 5.5% |
| | Total | | | | | | 149 | $311,157 | $1,827,665 | $217,579 | 308.8 | 2.1 | 17.0% |
| 2023 Q3 | Sosu x20990 | Iong | Snro | 2024-09-30 | | | 5 | $17,550 | $103,400 | $4,657 | 7.4 | 1.5 | 17.0% |
| | Sosu x30090 | Iono | Iou1 | 2024-09-15 | Yes | $19,765 | 74 | $197,651 | $394,195 | $61,902 | 339.7 | 4.6 | 50.1% |
| | Sosu x30090 | Iono | Iiv | 2024-09-20 | | | 22 | $4,141 | $416,510 | $31,347 | 28.5 | 1.3 | 1.0% |
| | Sos xu80945 | Iun | Iiv | 2024-09-15 | | | 40 | $51,541 | $194,830 | $18,114 | 135.3 | 3.4 | 26.5% |
| | Sosu x30090 | Iono | Iur | 2024-06-02 | | | 40 | ($12,767) | $239,495 | $26,497 | 65.3 | 1.6 | (5.3%) |
| | Total | | | | | | 181 | $258,116 | $1,348,430 | $142,517 | 576.2 | 3.2 | 19.1% |
| 2023 Q2 | Sosu x28995 | Iono | Snro | 2024-09-15 | Yes | $13,001 | 46 | $130,007 | $276,480 | $33,414 | 164.6 | 3.6 | 47.0% |
| | Sosu | 9 Io o | Il | 2024-09-20 | | | 33 | $53,690 | $105,305 | $8,764 | 20.7 | 0.6 | 51.0% |
| | Sosu x 6 Iou | Ifh | 2024-09-15 | | | 33 | $12,335 | $155,100 | $13,690 | 109.0 | 3.3 | 8.0% |
| | Sosu x20995 | Iuns | Iiv | 2024-06-02 | | | 32 | $75,871 | $135,595 | $16,451 | 48.3 | 1.5 | 56.0% |
| | Total | | | | | | 144 | $271,903 | $672,480 | $72,319 | 342.5 | 2.4 | 40.4% |
| 2023 Q1 | Sosu 996 | Iono | Iiur | 2024-09-30 | | | 4 | $11,025 | $71,100 | $2,970 | 4.2 | 1.0 | 15.5% |
| | Total | 5 Iu | Tu | 2024-01-28 | | | 1 | $7,900 | $7,900 | $1,126 | 1.9 | 1.9 | 100.0% |
| | Sosu x80995 | Iur | Siue | 2024-09-15 | | | 16 | $14,115 | $66,300 | $9,122 | 33.6 | 2.1 | 21.3% |
| | Sosu x30096 | Iono | Il | 2024-09-20 | | | 34 | ($8,789) | $228,000 | $28,429 | 50.7 | 1.5 | (3.9%) |
| | Sosu x 6 Iu | Ior | 2024-09-15 | | | 4 | $3,745 | $10,200 | $455 | 5.0 | 1.3 | 36.7% |
| | Sosu x30996 | Iono | Iiu | 2024-06-02 | No | $10,186 | 44 | $101,857 | $268,210 | $37,851 | 85.5 | 1.9 | 38.0% |
| | Total | | | | | | 103 | $129,853 | $651,710 | $79,952 | 180.8 | 1.8 | 19.9% |
| 2022 Q4 | Sosu x 996 | Iono | 6c Iiung | 2024-09-30 | | | 7 | $6,370 | $109,500 | $6,917 | 6.0 | 0.9 | 5.8% |
| | Total | 6 I | | 2024-01-28 | | | 3 | $5,000 | $12,100 | $3,685 | 3.5 | 1.2 | 41.3% |
| | Sosu x 6 Iu | Il | 2024-09-15 | | | 17 | $38,520 | $112,300 | $10,877 | 54.5 | 3.2 | 34.3% |
| | Sosu 6 Iono | | 2024-09-20 | Yes | $28,982 | 46 | $289,819 | $764,000 | $115,781 | 132.9 | 2.9 | 37.9% |
| | Total x30 6 Tor | Siung Nellie | 2024-06-11 | Yes | $10,308 | 1 | $103,075 | $140,000 | $7,962 | 6.7 | 6.7 | 73.6% |
| | Sosu x12095G | Iono | Siono | 2024-06-02 | | | 64 | $69,688 | $948,920 | $130,490 | 174.7 | 2.7 | 7.3% |
| | Total | | | | | | 138 | $512,472 | $2,086,820 | $275,711 | 378.3 | 2.7 | 24.6% |
| 2022 Q3 | Sosu x u-06 Io09 | Iu Iunr | 2024-09-30 | | | 9 | ($4,400) | $97,200 | $7,784 | 9.3 | 1.0 | (4.5%) |

68.     Another publicly disclosed stolen document contains an internal employee compensation and payroll report for Rivers Casino Philadelphia. This spreadsheet includes

employee names, unique identification numbers, department assignments, job positions, monthly

compensation values, and internal personnel classifications. Exposure of this data creates serious

risks for employees, including identity theft, financial fraud, and personal privacy violations. The

disclosure of employees' names, salaries, and job titles puts them at heightened risk of targeted

scams, phishing attacks, and financial fraud.



69.    Another stolen document contains patron financial records, exposing sensitive

personal and financial information of patrons. This document includes patron names, mailing

addresses, phone numbers, email addresses, permanent credit limits, and account activities. The

exposure of this document has directly compromised the privacy and financial security of Rivers

Casino Philadelphia patrons. Consumers' full names and addresses are now publicly available

alongside their financial limits and contact information, creating opportunities for identity theft,

targeted financial scams, and fraudulent credit activities.

| Patron ID | Patron Name | Permanent Credit Limit | Mailing Address | City | State | Zip | Phone Numb | E-mail address, if available | Date Active | Date of Last Updat | 2 year Update (700 days or 1.9 years) | If account is closed, date of closure | Reason for Closur |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $500,00 | | Woodbury | NJ | 08096-1826 | | | 14.04.2019 | 06.07.2024 | 06.06.2026 | | |
| | | $7 500,00 | | Philadelphia | PA | 19120-3020 | | | 22.08.2012 | 15.03.2023 | 12.02.2025 | | |
| | | $1 000,00 | | Havertown | PA | 19083-1320 | | | 22.08.2017 | 16.03.2023 | 13.02.2025 | | |
| | | $175 000,00 | | West Palm Beach | FL | 33411-0000 | | | 19.09.2015 | 11.06.2024 | 12.05.2026 | | |
| | | $1 000,00 | | Philadelphia | PA | 19145-2301 | | | 12.10.2019 | 01.03.2022 | 30.01.2024 DUE FOR UPDATE | | Left Vm fro her to call back |
| | | $7 000,00 | | Philadelphia | PA | 19128-0000 | | | 09.03.2012 | 10.10.2023 | 09.09.2025 | | |
| | | $4 000,00 | | Philadelphia | PA | 19152-0000 | | | 26.03.2012 | 14.03.2023 | 11.02.2025 | | |
| | | $1 000,00 | | Philadelphia | PA | 19126-0000 | | | 15.06.2016 | 17.03.2023 | 14.02.2025 | | |
| | | $1 500,00 | | Philadelphia | PA | 19126-0000 | | | 19.02.2014 | 14.03.2023 | 11.02.2025 | | |
| | | $5 000,00 | | Philadelphia | PA | 19154-0000 | | | 04.08.2012 | 11.03.2023 | 08.02.2025 | | |
| | | $10 000,00 | | Fort Washington | PA | 19034-0000 | | | 07.10.2022 | 06.12.2023 | 05.11.2025 | | |
| | | $10 000,00 | | Flushing | NY | 11368-0000 | | | 04.02.2023 | 04.02.2023 | 04.01.2025 | | |
| | | $5 000,00 | | Clementon | NJ | 08021-0000 | | | 23.03.2023 | 23.03.2023 | 20.02.2025 | | |
| | | $10 000,00 | | Philadelphia | PA | 19103-0000 | | | 05.08.2011 | 18.06.2024 | 19.05.2026 | | |
| | | $15 000 | | Huntington Station | NY | 11746-0000 | | | 02.10.2010 | 02.07.2024 | 02.06.2026 | | |
| | | $10 000,00 | | Flusing | NY | 11356-0000 | | | 03.08.2024 | 03.08.2024 | 04.07.2026 | | |
| | | $15 000,00 | | Camden | NJ | 08105 | | | 30.08.2024 | 30.08.2024 | 31.07.2026 | | |
| | | $10 000,00 | | West Chester | PA | 19382-762 | | | 23.09.2024 | 23.09.2024 | 24.08.2026 | | |

70.     Despite the scope of the Data Breach and risks posed to its patrons, employees, and other affiliated persons, Rivers Casino has not explained how attackers gained access, has not provided an update on the status of the stolen information, nor has it disclosed what measures, if any, it has taken to prevent further exposure of stolen data.[8]

71.     On February 3, 2025, the full data set that Cicada3301 extracted, exfiltrated, and scraped—containing Plaintiffs' and Class Members' PII —was leaked on the dark web, where it became freely available for all to download.

72.     As of February 18, 2025, the full data set has been viewed at least 9,296 times. Given the nature of dark web dissemination, Plaintiffs and Class Members are informed and believe that the data has been further seeded, rehosted, fragmented, mirrored, and distributed across multiple forums, peer-to-peer networks, and underground marketplaces, compounding the harm to Plaintiffs and Class Members.

73.     Because the PII is published on the dark web, it is available for the whole world to access, view, obtain, and use to commit a host of crimes.

74.     Simply put, Plaintiffs and Class Members **already have suffered actual misuse** of their PII by cybercriminals due to the publication of this sensitive data.

---

[8] *Id.*

16

**E.    Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' PII**

75.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

76.    Plaintiffs and Class Members relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, to provide the information only to trusted and secure vendors and other third parties, and to make only authorized disclosures of this information.

77.    Defendants derive a substantial economic benefit from providing services to their customers and hiring individuals for employment, and as a part of providing those services and that employment, Defendants retain and store the PII of their customers and of other individuals who are employed, interact, or otherwise transact with Defendants for business purposes, including that of Plaintiffs and Class Members.

78.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting the PII from disclosure.

79.    Defendants not only collected and stored this PII but retained extensive financial and personal records, including payroll, vendor transactions, and patron data. The Data Breach resulted in the exposure of at least 8,151 confirmed individuals.[9]

80.    Defendants could have prevented this Data Breach by properly securing the PII of Plaintiffs and Class Members. Defendants failed to implement adequate security measures, allowing Cicada3301, a ransomware gang, to infiltrate their data systems in or around November 2024 and extract 2.56 terabytes of consumer and employee data, including PII.

---

[9] Bischoff, *supra*, note 3.

81.     Defendants' negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by their disregard for repeated public warnings and alerts directed at protecting and securing sensitive data.

**F.      Defendants Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Susceptible to Cyberattacks**

82.     Data thieves regularly target companies that receive and maintain PII due to the highly sensitive nature of that information. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

83.     Defendants' data security obligations were particularly important given the ubiquity of cyberattacks and/or data breaches targeting institutions that collect and store PII, like Defendants, preceding the date of the Data Breach.

84.     In 2023, a record 3,205 publicly reported data breaches occurred, resulting in approximately 353,027,982 individuals being compromised, a 78% increase from a record high 2022.[10]

85.     In view of the continuing spike in data breaches and the nature and value of the PII, Defendants knew or should have known the PII they collected and maintained would be targeted by cybercriminals. This is especially so, in light of the widely publicized 2023 MGM data breach, which underscored the significant cybersecurity risks faced by casinos and the gaming industry.[11] Despite this, Defendants failed to take adequate measures to safeguard their systems and protect

---

[10] *ITRC 2023 Data Breach Report – Key Findings and Solutions*, Bluefin, https://www.bluefin.com/bluefin-news/itrc-2023-data-breach-report-key-findings-and-solutions/ (last visited Apr. 17, 2025).

[11] See Katherine Sayre, *MGM Agrees to Pay $45 Million to Settle Data Breach Lawsuit*, Wall St. J. (Feb. 13, 2024), https://www.wsj.com/articles/mgm-agrees-to-pay-45-million-to-settle-data-breach-lawsuit-e076c842.

the sensitive information of their patrons, allowing it to be published on the dark web by Cicada3301, and thereby exposing Plaintiffs and Class Members to foreseeable harm.

86.     As custodians of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

87.     PII is a valuable property right.[12] The value of PII as a commodity is measurable.[13] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[14] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[15] PII is so valuable to identity thieves that once it has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

88.     As a result of the real and significant value of this data, identity thieves and other cybercriminals have openly posted credit card numbers, Social Security numbers, bank account information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the

---

[12] Marc van Lieshout, *The Value of Personal Data*, ResearchGate (May 2015) https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data, ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]").

[13] Robert Lowes, *Stolen EHR Charts Sell for $50 Each on Black Market*, Medscape (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[14] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLibrary (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[15] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

89.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the figure is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[16]

90.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

91.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data they collected and maintained and, thus, the significant number of individuals who would be harmed by the exposure of that data.

92.    Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

93.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

94.    The ramifications of Defendants' failure to keep secure the PII of Plaintiffs and Class Members are severe and long-lasting. Once PII is stolen—particularly Social Security

---

[16] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*: *An Experimental Study*, Information Systems Research (June 2011), https://www.jstor.org/stable/23015560?seq=1.

20

numbers, which are confirmed to be impacted here—fraudulent use of that information and damage to victims may continue for years.

### G.     Value of Sensitive Personal Information

95.     The fact that Defendants have a privacy policy shows that they understood the protected PII they transfer, acquire, store, and utilize is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.[17]

96.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

97.     When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[20]

98.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[21]

---

[17] *Privacy Policy*, *supra*, n.1.

[18] 17 C.F.R. § 248.201 (2016).

[19] *Id.*

[20] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited Apr. 17, 2025).

[21] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.

99.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[22]

100.    The dark web is a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

101.    When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[23] For example, PII can be sold at a price ranging from $40 to $200.[24] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[25]

102.    The PII exfiltrated in the Data Breach can be used to commit identity theft by placing Plaintiffs and Class Members at a heightened risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cyber criminals to exploit information they already have in order to get even more PII from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

---

[22] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[23] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring last visited Jan. 6, 2025).

[24] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[25] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr.17, 2025).

103.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, payment card information in a retailer data breach because, in a payment card information breach, victims can cancel or close credit and debit card accounts. The type of highly sensitive information compromised in this Data Breach—Social Security numbers—is impossible to "close" and difficult, if not impossible, to change.

104.    Indeed, due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[26]

105.    Social Security numbers and other highly sensitive information (e.g., bank account information) demand a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[27]

106.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

107.    People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as

---

[26] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[27] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

severe distress and other strong emotions and physical reactions.[28]

108.    People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[29] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiffs and Class members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."[30]

109.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

---

[28] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.
[29] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.
[30] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.
[31] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extend Is Unknown*, U.S. Gov't Accountability Off. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

**H.      Defendants Failed to Comply with FTC Guidelines**

110.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

111.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

112.    The FTC further recommends that companies avoid storing PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

113.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

25

114.    The FTC publishes guides for businesses for cybersecurity[32] and protection of PII,[33] recommending that businesses:

a.  Identify all connections to the computers where they store sensitive information.

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

---

[32] *Start with Security: A Guide for Business*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[33] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

115. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

116. Defendants were at all times fully aware of their obligation to protect the PII they were entrusted with, yet failed to comply with such obligation. Defendants were also aware of the significant repercussions that would result from their failure to do so.

27

## I.    Defendants Failed to Comply with Industry Standards

117.    As noted above, experts studying cybersecurity routinely identify institutions like Defendants as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

118.    Some industry best practices that should be implemented by companies dealing with sensitive PII, like Defendants, include, but are not limited to: educating all employees; strong password requirements; multilayer security, including firewalls; anti-virus and anti-malware software; encryption; multi-factor authentication; backing up data; and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry-best practices.

119.    Other best cybersecurity practices that are standard at large institutions that store PII include, without limitation:

   a.   installing appropriate malware detection software;

   b.   monitoring and limiting network ports;

   c.   protecting web browsers and email management systems;

   d.   setting up network systems such as firewalls, switches, and routers;

   e.   monitoring and protecting physical security systems;

   f.   monitoring for suspicious or irregular traffic to servers;

   g.   monitoring for suspicious credentials used to access servers;

   h.   monitoring for suspicious or irregular activity by known users;

   i.   monitoring for suspicious or unknown users;

   j.   monitoring for server requests for PII;

   k.   Monitoring for server requests from VPNs;

l.  Monitoring for server requests from Tor exit nodes; and

m.  training staff regarding these points.

120.  As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

121.  Defendants failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

122.  The foregoing frameworks are existing and applicable industry standards in the corporate sector. Defendants' failure to comply with these accepted standards opened the door to cybercriminals, causing the Data Breach.

123.  Despite Defendants' obligations, Defendants failed to appropriately monitor and maintain their data security systems in a meaningful way so as to prevent the Data Breach.

124.  Had Defendants properly maintained their systems and adequately protected them, they could have prevented the Data Breach and prevented cybercriminals such as Cicada3301 from publishing Plaintiffs' and Class Members' PII.

**J.    Defendants Failed to Timely Notify Plaintiffs and Class Members**

125.  According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[34] According

---

[34] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020)
https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Jan. 6, 2025).

to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[35]

126.    Defendants did not rapidly report to Plaintiffs' and Class Members that their PII had been stolen. Defendants waited approximately six weeks after being made aware of the Data Breach to notify impacted individuals.

127.    Defendants only began notifying certain affected persons of the Data Breach by U.S. mail on December 30, 2024, and others on February 28, 2025, despite having access to more expedient means of communication, such as email, for much of the Plaintiffs and Class Members.

128.    According to UK security firm Sophos, "[c]yberattackers on average have 11 days after breaching a target network before they're being detected...and often when they are spotted it's because they've deployed ransomware."[36] Sophos found that this was "more than enough time for an attacker to get a thorough overview of what a target network looks like, where their weaknesses lie, and for ransomware attackers to wreck it."[37]

129.    To put in context, according to Sophos, "11 days potentially provide attackers with approximately 264 hours for malicious activity, such as lateral movement, reconnaissance, credential dumping, data exfiltration, and more. Considering that some of these activities can take just minutes or a few hours to implement, 11 days provide attackers with plenty of time to do damage."[38]

130.    Defendants allowed cybercriminals access to their systems for an unknown period

---

[35] *Id.*

[36] Danny Palmer, *This Is How Long Hackers Will Spend in Your Network Before Deploying Ransomware or Being Spotted*, ZDNet (Feb. 17, 2025), https://www.zdnet.com/article/this-is-how-long-hackers-will-spend-in-your-network-before-deploying-ransomware-or-being-spotted/.

[37] *Id.*

[38] *Id.*

of time, failing to detect or stop the unauthorized exfiltration until November 18, 2024. Even after detecting the Data Breach, Defendants further delayed notifying the Plaintiffs and Class Members, leaving them unaware that their PII had been stolen and exposed on the dark web. As a result, Plaintiffs were deprived of a window of opportunity to take preventative measures such as rapid reporting.

### K.    Defendants Breached Duties to Safeguard PII

131.    In addition to their obligations under federal laws, Defendants owed duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed duties to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the PII of Class Members. As a result, in or around November 2024, the ransomware group Cicada3301 infiltrated Defendants' systems and exfiltrated 2.56 terabytes of Plaintiffs' and Class Members' PII.

132.    Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of PII in a timely manner.

133.    Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

134.    Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of Defendants' inadequate data security practices.

135.    Defendants breached obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of their data security

practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect customers' and other related individuals' PII;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

e. Failing to adhere to industry standards for cybersecurity as discussed above;

f. Failing to ensure that all personnel were trained to comply with FTC guidelines and industry standards

g. Failing to disclose that they did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' PII;

h. Concealing the existence and extent of the Data Breach for an unreasonable duration of time;

i. Failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach; and

j. Otherwise breaching duties and obligations to protect Plaintiffs' and Class Members' PII.

136.    Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted PII.

137.    Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

**L.    Common Injuries and Damages**

138.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of the value of their PII, which has now been accessed and viewed at least 9,293 times on the dark web as of February 18, 2025, increasing its exposure and risk of exploitation; and (e) the continued risk to their PII, which remains in the possession of Defendants and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

139.    The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach, require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security, including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting

and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

**M.    The Data Breach Increases Victims' Risk of Identity Theft**

140.    Due to the Data Breach, Plaintiffs and Class Members are at an indefinite, heightened risk of identity theft. The stolen PII, which includes Social Security numbers, banking details, and other highly sensitive information, was made publicly available on the dark web on February 3, 2025. By February 18, 2025, the leaked PII had been accessed at least 9,296 times, further increasing the risk of fraudulent use.

141.    In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members.

142.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

143.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

144.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's log-in credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information

34

through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

145. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[39]

146. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

147. The development of "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, driver's license numbers, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

148. Identity theft is not an easy problem to solve. In a survey, the Identity Theft

---

[39] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KrebsOnSecurity (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[40]

149.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[41]

150.    It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market. The publication of Plaintiffs' and Class Members' PII on the dark web ensures that it will continue to be available to cybercriminals indefinitely, putting Plaintiffs and Class Members at persistent and unavoidable risk.

**N.    Loss of Time to Mitigate Risk of Identity Theft and Fraud**

151.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

152.    Plaintiffs and Class Members have spent, and will spend additional time in the

---

[40] *2023 Consumer Impact Report*, Identity Theft Resource Center (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last visited Apr.17, 2025).

[41] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, Journal of Systemics, Cybernetics and Informatics (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

153.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[42]

154.    These efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[43]

**O.    Diminution of Value of PII**

155.    PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyberthefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

156.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[44]

---

[42] *See Data Breaches Are Frequent . . ., supra* n.28.
[43] *What To Do Right Away,* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Apr. 17, 2025).
[44] David Lazarus, *Shadowy data brokers make the most of their cloak,* Los Angeles Times (Nov. 5, 2019, 5 AM PT), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

157.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[45]

158.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[46]

159.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[47]

160.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs' or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

**P.    Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

161.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the 2.56 terabytes of data obtained in the Data Breach, there is a strong probability that Plaintiffs and Class Members PII that was published on the dark web will be purchased by criminals intending to utilize the PII for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

---

[45] Datacoup, Inc, https://datacoup.com/ (last visited Apr. 17, 2025).
[46] *Frequently Asked Questions*, Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Apr. 17, 2025).
[47] Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

162. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

163. Consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

164. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost, for a minimum of five years, that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

**Q.      Plaintiffs' Experiences**

***Plaintiff Kevin Brady's Experience***

165. Plaintiff Brady values his privacy and makes every effort to keep his personal information private.

166. Plaintiff Brady only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his PII.

167. In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff Brady suffered injury from a loss of privacy.

168. Plaintiff Brady has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff Brady entrusted to Defendant. This information has inherent value that Plaintiff Brady was deprived of when his PII was placed on a

publicly accessible database, exfiltrated by cybercriminals.

169. Plaintiff Brady's PII has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of an increased number of spam/phishing calls and texts as a result of the Data Breach. Additionally, soon after the breach, Plaintiff Brady received a scam call requesting an authentication code sent to his phone to access his Wells Fargo account. The scam caller had access to Plaintiff's account information. Plaintiff Brady did not supply the code and changed his account information including his username and password. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Brady's life as a whole, and specifically caused financial strain on him/her as a direct result of the Data Breach.

170. Furthermore, Plaintiff Brady has experienced a significant increase in phishing emails and spam and texts as a result of the Data Breach. [repetitive of first sentence of pgh 169]

171. The Data Breach has also caused Plaintiff Brady to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

172. As a result of the actual harm, he has suffered and the present and increased imminent risk of future harm. [can probably delete – repetitive of previous pgh]

173. In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred, and changing his account information on his compromised Wells Fargo account, and dealing with increased spam texts and calls. This time, which has been lost forever and cannot be recaptured, was spent at the Defendants' direction.

174. The present and substantial risk of imminent harm and loss of privacy have caused Plaintiff Brady to suffer stress, fear, and anxiety.

175. Plaintiff Brady has a continuing interest in ensuring that Plaintiff Brady's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Shawn Martin's Experience*

176. Plaintiff Martin values his privacy and makes every effort to keep his personal information private.

177. Plaintiff Martin only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his PII.

178. In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

179. Plaintiff Martin has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

180. Furthermore, Plaintiff Martin has experienced a tremendous increase in spam calls and texts as a result of the Data Breach.

181. The Data Breach has also caused Plaintiff Martin to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

182. As a result of the actual harm he has suffered and the present and increased

41

imminent risk of future harm, Plaintiff Martin has spent a great deal of time dealing with the spam calls and texts as well as constantly monitoring his financial accounts.

183.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Martin to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at the Defendants' direction.

184.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety.

185.    Plaintiff has a continuing interest in ensuring that Plaintiff's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Plaintiff Robert Volio's Experience

186.    Plaintiff Volio values his privacy and makes every effort to keep his personal information private.

187.    Plaintiff Robert Volio only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

188.    In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

189.    Plaintiff Volio has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant.

This information has inherent value that Plaintiff was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

190. Furthermore, Plaintiff Volio has experienced a notable uptick in spam calls, which he suspects to be phishing attempts, as a result of the Data Breach.

191. The Data Breach has also caused Plaintiff Volio to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

192. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Volio made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, going in-person to Defendant's casino to inquire about the Data Breach and learn more details about its occurrence, and monitoring his financial accounts for unusual activity, which may take years to detect.

193. In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Volio to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at the Defendants' direction.

194. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Volio to suffer stress, fear, and anxiety, which has been compounded by the fact that Defendants have still not fully informed Plaintiff of key details about the Data Breach's occurrence.

195. Plaintiff Volio has a continuing interest in ensuring that Plaintiff's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded

43

from future breaches.

### *Plaintiff Casey Tierney's Experience*

196.    Plaintiff Tierney values his privacy and makes every effort to keep his personal information private.

197.    Plaintiff Tierney only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as requiring passwords and multi-factor authentication to access databases storing his PII.

198.    In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

199.    Plaintiff Tierney has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

200.    Plaintiff Tierney's PII has already been stolen and misused as he has experienced incidents of fraud and identity theft in the form of unauthorized attempts to log into his Apple account, using the same email address and password he used as an employee of Defendants. These actions by third parties have detrimentally impacted Plaintiff's life as a whole, and specifically caused financial strain on him/her as a direct result of the Data Breach.

201.    Furthermore, Plaintiff Tierney has experienced a significant increase in spam phone calls and emails as a result of the Data Breach, to the point that Plaintiff was receiving so many spam emails a day that he abandoned the email address as unusable. These spam phone calls and emails were made to the same phone number and email address that Plaintiff Tierney provided to Defendant.

202.    The Data Breach has also caused Plaintiff Tierney to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

203.    As a result of the actual harm he has suffered and the present and increased imminent risk of future harm, Plaintiff Tierney was forced to spend a significant amount of time changing the usernames and passwords of his bank accounts, credit cards, and social media accounts. The lost time was especially significant to Plaintiff Tierney as he was and continues to be a full-time student and employed full-time.

204.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Tierney to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at the Defendants' direction.

205.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety.

206.    Plaintiff Tierney has a continuing interest in ensuring that Plaintiff's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Aniello Barrella's Experience*

207.    Plaintiff Barella values his privacy and makes every effort to keep his personal information private.

208.    Plaintiff Barrella only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his PII, such as

45

requiring passwords and multi-factor authentication to access databases storing his PII

209.    In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff Barella suffered injury from a loss of privacy.

210.    Plaintiff Barella has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Barella was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

211.    Plaintiff Barella's PII has already been stolen and misused as he has experienced incidents of fraud and identity theft in the form of numerous inquiries from financial institutions for accounts and credit cards he did not open or authorize. These actions by unauthorized third parties have detrimentally impacted Plaintiff Barella's life as a whole and specifically caused financial strain on him as a direct result of the Data Breach.

212.    Furthermore, Plaintiff Barella has experienced a tremendous increase in spam calls, texts and emails because of the Data Breach. Plaintiff also incurs a monthly expense for credit monitoring which he purchased as a result of the Data Breach.

213.    The Data Breach has also caused Plaintiff Barella to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

214.    As a result of the actual harm he has suffered and the present and increased imminent risk of future harm, Plaintiff has expended a tremendous amount of time contacting financial institutions and monitoring his financial accounts which he does on a daily basis.

215.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff to spend significant time dealing with issues related to the Data Breach, which

includes time spent verifying the legitimacy of the Data Breach Notice Letter, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendants' direction.

216. The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety.

217. Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Plaintiff Mark Metzler's Experience

218. Plaintiff Metzler values his privacy and makes every effort to keep his personal information private.

219. Plaintiff Metzler only allowed Defendants to maintain, store, and use his PII because he believed that Defendants would use basic security measures to protect his private PII, such as requiring passwords and multi-factor authentication to access databases storing his PII.

220. In the instant that his PII was accessed and obtained by a third party without his consent or authorization, Plaintiff Metzler suffered injury from a loss of privacy.

221. Plaintiff Metzler has been further injured by the damages to and diminution in value of his PII—a form of intangible property that Plaintiff Metzler entrusted to Defendant. This information has inherent value that Plaintiff Metzler was deprived of when his PII was placed on a publicly accessible database, exfiltrated by cybercriminals.

222. Plaintiff Metzler's PII has already been stolen and misused, resulting in five fraudulent charges on his Wells Fargo credit card from Peacock. Specifically, one charge of $13.99 occurred on December 17, 2024; charges of $6 and $7.99 were made on January 17, 2025; and

additional charges of $6 and $7.99 on February 17, 2025. Such fraudulent charges could have been avoided had Defendants implemented reasonable security measures, and timely notified Plaintiff Metzler of the Data Breach. Although Plaintiff Metzler was able to get a refund for these fraudulent charges, it was not without struggle. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Metzler's life as a whole, and specifically caused financial strain on him/her as a direct result of the Data Breach.

223.    Furthermore, Plaintiff Metzler has experienced a significant increase in phishing emails and spam and texts as a result of the Data Breach.

224.    The Data Breach has also caused Plaintiff Metzler to suffer imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

225.    As a result of the actual harm, he has suffered and the present and increased imminent risk of future harm.

226.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Data Breach Notice Letter, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred, changing his account information on his compromised Wells Fargo account, updating his online accounts with new credit card information, and dealing with increased spam texts and calls. This time, which has been lost forever and cannot be recaptured, was spent at the Defendants' direction.

227.    The present and substantial risk of imminent harm and loss of privacy have caused Plaintiff Metzler to suffer stress, fear, and anxiety.

228.    Plaintiff Metzler has a continuing interest in ensuring that his PII, which, upon

information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## V.  CLASS ALLEGATIONS

229.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek certification of the following classes (together, the "Classes"):

**Nationwide Class**
All individuals residing in the United States whose PII was compromised in the Data Breach, including all individuals who received notice of the Data Breach.

**Pennsylvania Class**
All individuals residing in Pennsylvania whose PII was compromised in the Data Breach, including all individuals who received notice of the Data Breach.

230.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities affiliated with Defendants and/or their officers and/or directors or any entity in which Defendants have a controlling interest. Also excluded are the officers, directors, agents, trustees, parents, children, corporations, trusts, affiliates, legal representatives, principals, partners, joint venturers, heirs, predecessors, successors, assigns of the Defendants and such entities. Additionally, any Judge to whom this case is assigned, as well as their judicial staff and immediate family members, is excluded.

231.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as to add subclasses, before the Court determines whether certification is appropriate.

232.    The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

233.    **Numerosity**. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believe the proposed Class includes many tens or hundreds of thousands of individuals who have been damaged by Defendants' conduct as

alleged herein. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendants' records.

234.    **Commonality**. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants' conduct violated the FTCA;

c. When Defendants learned of the Data Breach;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f. Whether Defendants' data security systems, prior to and during the Data Breach, were consistent with industry standards;

g. Whether Defendants owed a duty or duties to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

h. Whether Defendants owed duties to Class Members to safeguard their PII;

i. Whether Defendants failed to establish appropriate administrative, technical, and/or physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

j. Whether the security provided by Defendants was satisfactory to protect customer information as compared to industry standards;

k.  Whether Defendants misrepresented or failed to provide adequate information to customers regarding the type of security practices used;

l.  Whether third parties obtained Class Members' PII via the Data Breach;

m.  Whether Defendants had legal duties to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.  Whether Defendants breached duties to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

o.  Whether Defendants knew or should have known their data security systems and monitoring processes were deficient to keep Plaintiffs and Class Members' PII secure and prevent loss or misuse of that PII;

p.  What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

q.  Whether Defendants' conduct was negligent;

r.  Whether Defendants breached implied contracts with Plaintiffs and Class Members;

s.  Whether Defendant's conduct violated the statutes as set forth herein;

t.  Whether Defendants took sufficient steps to secure individual's PII;

u.  Whether Defendants' conduct violated Plaintiffs' and Class Members' privacy;

v.  Whether Defendants were unjustly enriched;

w.  Whether Plaintiffs and Class Members are entitled to damages;

x.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

y.  Whether Plaintiffs and Class Members are entitled to equitable relief, including

51

injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

235.    **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through Defendants' common misconduct. Plaintiffs are advancing the same claims and legal theories on behalf of Plaintiffs and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

236.    **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

237.    **Predominance**. Defendants have engaged in common courses of conduct toward Plaintiffs and Class Members. For example, all of Plaintiffs' and Class Members' data were stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

238.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high

52

and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

239.    **Manageability.** Plaintiffs and Counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

240.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

241.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names, email and/or postal addresses, and phone numbers of Class Members affected by the Data Breach.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Classes)**

242.    Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

53

243.    Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

244.    Defendants owed a duty to Plaintiffs and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in possession, custody, or control to prevent unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of their systems.

245.    Defendants knew the risks of collecting and storing Plaintiffs' and all other Class Members' PII and the importance of maintaining secure systems. Defendants knew of the many data breaches in recent years, including the widely publicized 2023 MGM Data Breach, that targeted companies that collect and maintain Social Security numbers and other sensitive consumer data.

246.    Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII.

247.    Defendants had, and continue to have, a duty to timely disclose that Plaintiffs' and Class Members' PII within their possession was compromised and precisely the types of information that was compromised. Despite detecting unauthorized access to their systems in mid-November 2024, Defendants failed to notify some breach victims of the Breach until December 30, 2024, a six-week delay, and others until February 28, 2025, a three-month delay, that deprived Plaintiffs and Class Members of the opportunity to take immediate protective measures.

248.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data

54

security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTCA, and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected individuals' PII.

249.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patrons and employees. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

250.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

251.    Given the nature of Defendants' business, the sensitivity and value of the PII they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring. Defendants stored sensitive PII, including Social Security numbers and banking information, without encryption, leaving it accessible to cybercriminals once their systems were breached.

252.    Defendants breached their duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiffs' and Class Members' PII.

253.    Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect

and prevent dissemination of Plaintiffs' and Class Members' PII.

254. Defendants breached their duties to timely disclose to Plaintiffs and Class Members that the PII within Defendants' possession might have been compromised and precisely the type of information compromised.

255. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiffs' and Class Members' PII. In violation of the FTC guidelines, *inter alia,* Defendants did not protect the PII they keep; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their networks' vulnerabilities; and failed to implement policies to correct security issues. As a result, Plaintiffs' and Class Members' PII was leaked onto the dark web on February 3, 2025, where it was accessed at least 9,296 times as of February 18, 2025.

256. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' PII to unauthorized individuals.

257. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' PII would result in injuries to Plaintiffs and Class Members.

258. But for Defendants' negligent conduct or breach of the above-described duties

owed to Plaintiffs and Class Members, their PII would not have been compromised.

259. As a result of Defendants' failure to timely notify Plaintiffs and Class Members that their PII had been compromised, Plaintiffs and Class Members are unable to timely make the necessary precautions to mitigate damages by preventing future fraud, such as by rapid reporting, which increased Plaintiffs and Class Members likelihood of becoming a victim of fraud.

260. No Plaintiffs nor Class Members contributed to the breach or subsequent misuse of their PII as described in this Complaint.

261. As a result of Defendants' above-described tort, wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) loss of time and out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

262. Defendants are liable to Plaintiffs and Class Members for the reasonable costs of future credit and identity monitoring services. Defendants are also liable to Plaintiffs and Class Members to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiffs and Class Members have spent and will continue to spend as a result of Defendants' negligence. Defendants are also liable to Plaintiffs and Class Members to the extent their PII has been diminished in value because

Plaintiffs and Class Members no longer control their PII and to whom it is disseminated.

## COUNT II
## NEGLIGENCE PER SE
### (On Behalf of Plaintiffs and the Classes)

263.    Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

264.    Defendants' duties arise from, *inter alia*, Section 5 of the FTCA, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

265.    Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other Class Members' PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtain and store, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and the other Class Members given that Plaintiffs and Class Members' PII was leaked on the dark web.

266.    Defendants' violations of Section 5 of the FTCA constitute negligence per se.

267.    Plaintiffs and Class Members are within the class of persons that Section 5 of the FTCA were intended to protect.

268.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA (and similar state statutes) was intended to guard against.

269.    It was reasonably foreseeable to Defendants that failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would

58

result in the release, disclosure, and dissemination of Plaintiffs' and Class Members' PII to unauthorized individuals.

270. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of Defendants' violations of law, including Section 5 of the FTCA. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to monitor, mitigate, and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Classes)

271. Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

272. Defendants required Plaintiffs and Class Members to provide, or authorize the transfer of, their PII in order for Defendants to provide their services or to gain employment with Defendants. In exchange, Defendants entered into implied contracts with Plaintiffs and Class Members in which Defendants agreed to comply with their statutory and common law duties to protect and safeguard Plaintiffs' and Class Members' PII and to timely notify them in the event of a data breach.

273. Implied in these exchanges was a promise by Defendants to ensure the PII of Plaintiffs and Class Members in their possession was only used for the agreed-upon reasons, and

that Defendants would take adequate measures to protect Plaintiffs' and Class Members' PII.

274. This exchange constituted an agreement and meeting of the minds between the parties.

275. A material term of this implied contract is a covenant by Defendants that they would take reasonable efforts to safeguard Plaintiffs' PII. Defendants breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

276. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendants.

277. Defendants' failure to implement adequate measures to protect the PII of Plaintiffs and Class Members violated the purpose of the agreement between the parties.

278. The losses and damages Plaintiffs and Class Members sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiffs and Class Members.

## COUNT IV
### BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the Classes)

279. Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

280. At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII that Plaintiffs and Class Members entrusted to Defendants.

281. As alleged herein and above, Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII would

be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

282. Plaintiffs and Class Members entrusted Defendants with their PII with the explicit and implicit understandings that Defendants would protect and not permit the PII to be disseminated to any unauthorized third parties.

283. Plaintiffs and Class Members also entrusted Defendants with their PII with the explicit and implicit understanding that Defendants would take precautions to protect their PII from unauthorized disclosure.

284. Defendants voluntarily received Plaintiffs' and Class Members' PII in confidence with the understanding that their PII would not be disclosed or disseminated to the public or any unauthorized third parties.

285. As a result of Defendants' failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

286. As a direct and proximate cause of Defendants' actions and omissions, Plaintiffs and Class Members suffered damages.

287. But for Defendants' disclosure of Plaintiffs and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, leaked on the dark web, viewed at least 9,296 times, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII as well as the resulting damages.

288. The injury and harm Plaintiffs and Class Members suffered was the reasonably

foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendants knew or should have known their methods of accepting and securing Plaintiffs' and Class Members' PII were inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and Class Members' PII.

289. As a direct and proximate result of Defendants' breach of their confidence with Plaintiffs and Class Members, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII of current and former people; and (viii) present and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

290. As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and the Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**COUNT V**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Classes)**

291.    Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

292.    Plaintiffs and Class members have objective reasonable expectations of solitude and seclusion in their personal and PII and the confidentiality of the content of personal information and non-public medical information.

293.    Defendants invaded Plaintiffs' and Class Members' right to privacy by allowing unauthorized access to PII and by negligently maintaining the confidentiality of Plaintiffs' and Class Members' PII, as set forth above.

294.    The intrusion was offensive and objectionable to Plaintiffs, Class Members, and to a reasonable person of ordinary sensibilities in that Plaintiffs' and Class Members' PII were disclosed without prior written authorization from Plaintiffs and Class Members.

295.    The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiffs and Class Members provided and disclosed their PII to Defendants privately with an intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

296.    As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs' and Class Members' PII was viewed, distributed, leaked on the dark web, where it was viewed at least 9,296 times, and used by persons without prior written authorization, and Plaintiffs and the Class suffered damages as described herein.

297.    Defendants are guilty of oppression, fraud, or malice by permitting the

unauthorized disclosure of Plaintiffs' and Class Members' PII with a willful and conscious disregard of their right to privacy.

298.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause Plaintiffs and Class Members great and irreparable injury in that the PII maintained by Defendants can be viewed, printed, distributed, and used by unauthorized persons. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiffs and Class Members, and Defendants may freely treat Plaintiffs' and Class Members' PII with sub-standard and insufficient protections.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes)**

299.    Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if full set forth herein.

300.    Plaintiffs and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Defendants and that was ultimately accessed or compromised in the Data Breach.

301.    As a recipient of consumers' PII, Defendants have fiduciary relationship to Plaintiffs and Class Members.

302.    Because of that fiduciary relationship, Defendants were provided with and stored private and valuable PII related to Plaintiffs and Class Members. Plaintiffs and Class Members were entitled to expect their information would remain confidential while in Defendants' possession.

303.    Defendants owed a fiduciary duty under common law to Plaintiffs and Class

Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

304. As a result of the parties' fiduciary relationship, Defendants had an obligation to maintain the confidentiality of the information within Plaintiffs' and Class Members' personal records.

305. Plaintiffs and Class Members have a privacy interest in personal matters, and Defendants had a fiduciary duty not to disclose their data.

306. Defendants had possession and knowledge of confidential PII of Plaintiffs and Class Members, information not generally known.

307. Plaintiffs and Class members did not consent to nor authorize Defendants to release or disclose their PII to unknown criminal actors.

308. Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by, among other things:

   a. mismanaging their system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

   b. mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks;

   c. failing to design and implement information safeguards to control these risks;

   d. failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.  failing to evaluate and adjust their information security program in light of the circumstances alleged herein;

f.  failing to detect the breach at the time it began or within a reasonable time thereafter;

g.  failing to follow their own privacy policies and practices published to their customers and employees; and

h.  failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII.

309.   But for Defendants' wrongful breach of their fiduciary duties owed to Plaintiffs and Class members, their PII would not have been stolen and leaked on the dark web, where it was viewed at least 9,296 times.

310.   As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered injuries, including:

a.  Theft of their PII;

b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their PII.

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach–including finding fraudulent charges,

cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

i.  Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

311.  As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT VII
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes)

312.  Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth

herein.

313. This count is pleaded in the alternative to any contract or future contract claims.

314. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from payments made by or on behalf of Plaintiffs and Class Members, like Plaintiffs, for services.

315. As such, a portion of the value and monies derived from payments made directly or indirectly by Class Members for services is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

316. Plaintiffs and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Defendants and that was ultimately compromised in the data breach. The misappropriated PII, which includes Social Security numbers and direct deposit banking details, has been accessed at least 9,296 times as of February 18, 2025.

317. Plaintiffs and Class Members directly or indirectly conferred a monetary benefit on Defendants in providing them with their valuable PII.

318. Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

319. In particular, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. By foregoing the necessary

protection, Defendants exposed 2.56 TB of highly sensitive data to cybercriminals, allowing them to extract and leak Plaintiffs' and Class Members' PII on the dark web.

320. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profit over the requisite security.

321. Defendants failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

322. Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits that Plaintiffs and Class Members conferred upon them because Defendants failed to adequately protect their PII. Plaintiffs and the proposed Class would not have provided their PII to Defendants had they known Defendants would not adequately protect their PII.

323. Plaintiffs and Class Members have no adequate remedy at law.

324. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' custody, control, and possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

325. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Defendants from their wrongful conduct, including specifically, the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiffs' and Class Members' PII, and/or compensatory damages.

326. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

**COUNT VIII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. § 2201**
**(On Behalf of Plaintiffs and the Classes)**

327. Plaintiffs reallege and incorporate by reference paragraphs 1-241 as if fully set forth herein.

328. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

329. Defendants owe a duty of care to Plaintiffs and Class Members that required them to adequately secure their PII.

330. Defendants still possess Plaintiffs' and Class Members' PII, yet do not adequately protect PII against the threat of another data breach.

331. Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class Members.

332. Actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendants' ongoing failure to address the security failings that led to such exposure.

333. There is no reason to believe that Defendants' employee training and security

70

measures are any more adequate now than they were before the Data Breach.

334. Plaintiffs, therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, being ordered as follows:

a. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

b. ordering that Defendants engage external security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

c. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

d. ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

e. ordering that Defendants audit, test, and train security personnel and employees regarding any new or modified data security policies and procedures;

f. ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any PII not necessary for provision of services;

g. ordering that Defendants conduct regular database scanning and security checks;

h.   prohibiting Defendants from maintaining PII of Plaintiffs and Class Members on a cloud-based database;

i.   requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

j.   ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive PII;

k.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

l.   requiring Defendants to meaningfully educate all class members about the threats they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

m.  requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the

Court's final judgment; and

n.  such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members, requests judgment against Defendants and that the Court enter an Order:

A.  Certifying this action as a class action and appointing Plaintiffs and counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.  Granting equitable relief and enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C.  Granting injunctive, declaratory, and/or other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.  For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.  For an award of punitive and treble damages, as allowable by law;

F.  For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.  Pre- and post-judgment interest on any amount awarded; and

H.  Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

73

Dated:  April 17, 2025

Respectfully submitted,

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA I.D. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel: (310) 474-9111
Fax: (310) 474-8585
aferich@ahdootwolfson.com

Kenneth J. Grunfeld (PA I.D. 84121)
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: (954) 525-4100
grunfeld@kolawyers.com

Gary M. Klinger (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: 866-252-0878
Fax: 865-522-0049
gklinger@milberg.com

Charles E. Schaffer (PA I.D. 76259)
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
cschaffer@lfsblaw.com

*Interim Co-Lead Class Counsel*

74